IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SKYSON USA, LLC, | ) | Civ. No. 09-00278 BMK |
| | ) | |
| Plaintiff, | ) | ORDER REVERSING FINAL |
| | ) | AGENCY DECISION |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER REVERSING FINAL AGENCY DECISION

Plaintiff Skyson USA, LLC filed this lawsuit seeking judicial review of the United States Department of Agriculture Food and Nutrition Service's ("FNS") Final Agency Decision, which permanently disqualified Skyson from participating in the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamp Program. FNS disqualified Skyson after finding that, from August 2008 through January 2009, Skyson violated the Food Stamp Act, 7 U.S.C. §§ 2011-2036, and governing regulations, 7 C.F.R. §§ 270-282. The four Violations found by FNS consisted of: (1) "an unusual number of transactions ending in a same cents value" that were made; (2) "multiple transactions were made from individual benefit accounts in unusually short periods of time"; (3) "the majority or all of individual recipient benefits were exhausted in

unusually short periods of time"; and (4) "excessively large purchase transactions were made from recipient accounts."  In this judicial review, Skyson challenges the four Violations, as well as the permanent disqualification.

In September 2009, the parties stipulated to waive oral argument in this case.  After careful consideration of the parties' briefs, the administrative record, and additional evidence submitted in this judicial review, the Court REVERSES the Final Agency Decision that Skyson committed the four Violations and that it be permanently disqualified from participating in SNAP.

## FACTUAL BACKGROUND

A.    Supplemental Nutrition Assistance Program

Congress designed SNAP to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."  7 U.S.C. § 2011.  The Secretary of Agriculture issues regulations for SNAP, and the Department of Agriculture's FNS administers the program. 7 U.S.C. § 2013(c); Young Choi Inc. v. United States, 639 F. Supp. 2d 1169, 1172 (D. Haw. 2009).

According to the Food Stamp Act, benefits received through SNAP "shall be used only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program."

7 U.S.C. § 2013(a); 7 C.F.R. § 278.2(a).  Pertinent regulations make clear that

SNAP benefits "may not be accepted in exchange for cash."  7 U.S.C. § 278.2(a).

"Trafficking" food stamp benefits is a violation defined as "the buying or selling of

[SNAP benefits] for cash or consideration other than eligible food."  7 C.F.R.

§ 271.2.  FNS shall permanently disqualify a store on the first occasion of a

trafficking violation.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

        In Hawaii, SNAP utilizes an Electronic Benefit Transfer ("EBT")

system, and SNAP recipients obtain their benefits through an EBT card.  Young

Choi Inc., 639 F. Supp. 2d at 1173.  Recipients use their EBT cards to pay for

eligible food purchases at authorized stores by inserting the card into a point-of-

sale device and entering a personal identification number.  Id.  The point-of-sale

device transmits the information on the sale to an associated host computer, which

processes and stores the information.  Id.

        The EBT system enables FNS to track benefits from the recipient to

the retailer, recording information on each benefit transaction.  Id.  The stored

electronic data includes the recipient's card number, the amount of the food stamp

purchase, the store number, and the date and time of the transaction.  Id.  This data

provides a tool for identifying the type and pattern of transactions indicative of

food stamp trafficking.  Id.

B.     Background Facts

Skyson is a small grocery store located in Kalihi, Oahu, and is near several low-income housing projects and homeless shelters.  (Son Decl'n ¶¶ 6, 10.) Most of Skyson's customers live in the nearby projects and shelters, and homeless families also shop there.  (Id. ¶ 43-44.)  Mr. Sky Son owns and has operated Skyson for sixteen years.  (Id. ¶ 6.)  He does not sell alcohol at his store for religious reasons and has been acknowledged for complying with Haw. Rev. Stat. § 709-908, which makes it unlawful to sell tobacco products to minors.  (Id. ¶¶ 7-9; Exs. 1, 2.)

Skyson primarily sells bulk food products, such as canned meats (including spam, corned beef, and beef stew), canned vegetables, dried noodles (including long rice and dried noodle soup), cereal, and frozen meats (including chicken thighs, teriyaki meat, and turkey wings).  (Ex. 3; Son Decl'n ¶¶ 19, 22.) Skyson's selection of food products includes cultural staples for its customers, many who are of Polynesian, Micronesian, and Pacific Islander ethnicity and live in nearby housing projects.  (Son Decl'n ¶ 12.)  For example, the Samoan culture utilizes "many cases of can[ned] goods and frozen foods" for cultural events such as funerals, weddings, and land title ceremonies.  (Ex. 3.)  Customers have

embraced Skyson as a place to purchase bulk food at a reasonable price. (Son Decl'n ¶ 14; Sasaki Decl'n at 3; Suwaiter Decl'n at 3.)

Skyson is a relatively small store, with a size of approximately 2,010 square feet. (Son Decl'n ¶¶ 15, 18.) Its size makes it easy for customers to move around, and repeat customers familiar with the store's layout can retrieve items quickly. (Id. ¶ 18.) The store includes a 960 ft$^3$ indoor freezer and a 1,760 ft$^3$ indoor refrigerator. (Id. ¶ 15.). Adjacent to the store are a 500 square feet dry storage space and a 490 ft$^3$ storage freezer. (Id. ¶¶ 16-17.)

Mr. Son purchases a significant portion of Skyson's food inventory from wholesale shopping clubs, such as Costco and Sam's Club. (Id. ¶ 23.) When pricing Skyson's items, Mr. Son routinely increases the wholesale price by 10% to 40%, but the markup is dependent on the item and market conditions. (Id. ¶ 28; AR 1237.) Although Skyson's prices are not static, most of its items are usually priced in an amount ending in 98 cents, such as a case of corned beef which sells for $79.98. (Son Decl'n ¶¶ 27, 29, 30; AR 990-93.) However, some items are priced at amounts ending in other values including zero cents, such as a case of dried noodle soup which sells for $10.00. (Son Decl'n ¶ 31.)

Skyson's business model includes a two-step checkout process. (Id. ¶ 34.) First, Mr. Son, who personally oversees the daily operations of the store,

creates a handwritten invoice and subtotals the amount.  (Id. ¶¶ 5, 34.)  As Mr. Son is very familiar with the pricing, he is able to total a customer's invoice very quickly.  (Id. ¶ 37.)  Second, the customer goes to the checkout stand, where a store clerk inputs the amount to be charged to the EBT card at one of two point-of-sale devices.  (Id. ¶ 34.)

Most of Skyson's monthly sales occur during the first ten days of any month because Skyson's customers receive their SNAP benefits at the beginning of the month.  (Id. ¶ 38.)  During the first ten days, Mr. Son makes several daily trips to Costco or Sam's Club to replenish the store's inventory.  (Id. ¶ 39.)  Because of its customers' shopping patterns, Skyson is more heavily stocked with inventory during the first ten days of the month than any other day of the month.  (Id. ¶ 40.)

Customers often return to Skyson within 24 hours to make additional purchases.  (Id. ¶¶ 37, 45-47.)  Sometimes, customers realize they forgot items while waiting for the EBT transaction and make an additional purchase seconds after the first one.  (Id. ¶ 48.)  Other times, customers return a few minutes later after realizing they forgot to purchase items.  (Id. ¶¶ 37, 47.)  Additionally, because Skyson has only two flat-bed hand carts and no shopping bags or baskets, customers sometimes make multiple trips to the store because all of their items

cannot fit in the carts or because the carts are in use by other customers so items need to be hand-carried in multiple trips.  (Id. ¶¶ 49, 52; AR 787.)

Skyson has participated in SNAP since 1993.  (Son Decl'n ¶ 53.)  In 1999, FNS permanently disqualified Mr. Son based on similar trafficking violations.  (Id. ¶¶ 54-55; Ex. 5; AR 2.)  However, after seeking administrative review, that decision was ultimately reversed by FNS.  (Son Decl'n ¶ 56; Ex. 6; AR 8-9.)

C.    Procedural History

On February 26, 2009, FNS sent Mr. Son a letter, charging Skyson with food stamp trafficking from August 2008 through January 2009. (AR 688-89.)  FNS asserted four Violations:  (1) "an unusual number of transactions ending in a same cents value" were made ("Violation #1"); (2) "multiple transactions were made from individual benefit accounts in unusually short periods of time" ("Violation #2"); (3) "the majority or all of individual recipient benefits were exhausted in unusually short periods of time" ("Violation #3"); and (4) "excessively large purchase transactions were made from recipient accounts" ("Violation #4").  (AR 688.)  Although the letter invited Mr. Son to submit an explanation or evidence opposing the charges, he did not respond to the letter because he says he did not receive it until later.  (Son Decl'n ¶ 59.)

7

After receiving no response to the charge letter, FNS sent Mr. Son a letter on March 13, 2009, finding that the Violations did occur and permanently disqualifying Skyson from participating in SNAP.  (AR 772-73.)  Mr. Son received that letter and requested an administrative review.  (AR 958-64.)  After the request for review was granted, Skyson provided supporting materials to FNS.  (Son Decl'n ¶¶ 61-62.)

On May 20, 2009, Administrative Review Officer Nancy Baca-Stepan ("Review Officer") upheld FNS's finding that Skyson committed the four Violations and its penalty of permanent disqualification.  (AR 1262-68.)  With respect to Violation #1 (same cents transactions), the Review Officer concluded trafficking occurred, reasoning:  "While it is plausible that SNAP households that purchased single items ending in such a cents value . . . would have had transaction amounts ending in '$0.98', it is also quite likely that such households would have purchased additional edible food items during their visit to [Skyson] . . . and their purchase totals would have ended in cents values other than '$0.98.'"  (AR 1265.)

The Review Officer also upheld Violation #2 (multiple transactions by an individual recipient in short time periods), reasoning:  "While it is not unreasonable for a customer or household to shop at any given store one or more times during a day, it is unlikely that multiple transactions in large, and in some

8

cases identical dollar amounts, . . . were strictly for eligible foods."  (AR 1266.)

Regarding homeless shoppers at Skyson, the Review Officer found their

transactions for large purchases to be unreasonable because she determined that

homeless people "likely did not have ready access to transportation" and "would

not have had the storage or preparation facilities needed to accommodate eligible

foods."  (AR 1265.)  The Review Officer also found it "questionable whether

[Skyson] had a sufficient stock of eligible food items on hand . . . to have justified

its overall SNAP redemptions."  (AR 1266.)  The Review Officer ultimately

upheld the Violations and permanent disqualification in her Final Agency

Decision.  (AR 1262.)

On June 17, 2009, Skyson filed the Complaint in this case, seeking

judicial review of the Final Agency Decision.  (Doc. 1.)

## STANDARD OF REVIEW

Any grocery store permanently disqualified from participating in

SNAP may bring an action for judicial review challenging the penalty by filing a

complaint against the United States in federal district court.  Kim v. United States,

121 F.3d 1269, 1271-72 (9th Cir. 1997) (citing 7 U.S.C. § 2023(13)).  The judicial

review "shall be a trial de novo . . . in which the court shall determine the validity

of the questioned administrative action."  7 U.S.C. § 2023(15).  A "trial de novo is

a trial which is not limited to the administrative record–the plaintiff 'may offer any

relevant evidence available to support his case, whether or not it has been

previously submitted to the agency.'" Kim, 121 F.3d at 1272.  "The burden is

placed upon the store owner to prove by a preponderance of the evidence that the

violations did not occur."  Id.

"Whereas the FNS finding that a firm violated the Food Stamp Act is

reviewed de novo, review of the sanction imposed by the FNS is governed by the

arbitrary and capricious standard."  Wong v. United States, 859 F.2d 129, 132 (9th

Cir. 1988).  Under that standard, the Court determines "whether the sanction is

'unwarranted in law or without justification in fact."  Id.

## DISCUSSION

Skyson challenges FNS's determination that it committed the four

Violations at issue and its permanent disqualification from SNAP.  FNS asserts this

Court should uphold its Final Agency Decision, arguing it is supported by the

administrative record.

FNS charged Skyson with trafficking food stamps.  "Trafficking" is

defined in the Food Stamp regulations as "the buying or selling of coupons, ATP

cards or other benefit instruments for cash or consideration other than eligible

food."  7 C.F.R. § 271.2.  To establish a violation of the regulations, "the

Government must show by admissible evidence that food stamp coupons were accepted by plaintiff as payment for ineligible items." Mansour v. United States, 2009 WL 3763778, No. CV F 08-1313 LJO DLB, at *10 (E.D. Cal. Nov. 9, 2009) (quoting Wehab v. Yeutter, 743 F. Supp. 1353, 1357 (N.D. Cal. 1990)); see also Young Choi Inc., 639 F. Supp. 2d at 1178. Although, in a trial de novo, the burden of proof shifts to the plaintiff to establish that the violation did not occur, on judicial review, the "existence of a violation is examined afresh" and the Court may "reach its own factual and legal conclusions." Kim, 121 F.3d at 1274; Young Choi Inc., 639 F. Supp. 2d at 1177.

In determining whether the alleged Violations occurred, evidence this Court may consider includes "facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system." 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a). As stated above, this Court is "not limited to the administrative record" and Skyson "may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." Kim, 121 F.3d at 1272.

The Court now turns to FNS's determination that Skyson trafficked food stamps.

11

A.      Skyson's Inventory of Eligible Food Items

In her Final Agency Decision, the Review Officer noted that, during

the relevant period, Skyson's SNAP redemptions totaled $669,900.17.  (AR 1266.)

Skyson maintains it purchased at least $665,080.84 worth of eligible food items

and sold $810,994.19 worth of eligible food to SNAP households after marking up

the prices.  (AR 1266.)  The Review Officer, however, "disallowed" $577,081.88

worth of Skyson's food purchases and "allowed" only $245,889.47 worth of food

purchases.  (AR 1253, 1266.)  Because the majority of Skyson's food purchases

was "disallowed," the Review Officer questioned "whether or not inventory

purchase of eligible food items support the volume of SNAP sales" at Skyson.

(AR 1267.)  On appeal, Skyson submits many receipts to support its argument that

FNS erred in disallowing those expenses.  (Ex. 4.)  According to Mr. Son, if his

purchases are "allowed," there is no question that he had a sufficient inventory to

support Skyson's volume of SNAP sales.

When the Review Officer was conducting her administrative review

of FNS's findings, Skyson provided monthly ledgers to her and asked whether she

needed more information.  (Ito 11/16/2009 Decl'n ¶¶ 5-6.)  The Review Officer

stated that she did not need further information, and Skyson did not receive any

request for receipts to substantiate its purchases of eligible food items.  (Id. ¶ 6.)

Without the receipts that showed Skyson's purchases were for eligible food items, however, the Review Officer determined that $577,081.88 of purchases made by Skyson would be "disallowed."  (AR 1253.)

         With respect to the "disallowed" items, most of the FNS's reasons for disallowing those purchases are unconvincing.  Many of Skyson's purchases from certain vendors were entirely disallowed because FNS could not determine the type of products they sold.  (AR 1219-36.)  For example, all purchases from Costco and other wholesale vendors were disallowed because FNS could not determine their product lines.  (AR 1219-36; 1238-52.)  In some instances, FNS conducted an internet search for the vendors and disallowed purchases from them because they did not have websites or because FNS was unable to reach them by phone. (AR 1219-20, 1225-27, 1230-35.)  Purchases were also disallowed from vendors who do sell eligible food items, but also sell other items in their product line. (AR 1223.)  For example, even though FNS determined KYD Distributors sells "30-40 food items," purchases from that vendor were disallowed because the majority of its product line is non-food items.  (AR 1223.)  Also, purchases from Modern Macaroni Company and Aloha Shoyu were disallowed because they sell non-food items, too.  (AR 1225, 1229.)

13

At the time the Review Officer issued her Final Agency Decision, the record did not contain receipts that Skyson provided to this Court on appeal.  As this Court is permitted to review evidence outside the administrative record, <u>Kim</u>, 121 F.3d at 1272, Skyson submitted receipts for purchases that the Review Officer "disallowed."  (Son Reply Decl'n ¶ 10; Ex. 4; Ex. 1, attached to Reply.)  Skyson even breaks each receipt down into eligible food items and non-eligible items. (Ex. 4.)  After deducting the non-eligible items, the receipts show that Skyson purchased $419,191.37 worth of eligible food items that the Review Officer had disallowed.  (Ex. 4; Son Decl'n ¶¶ 24-25[1].)  After adding that amount to $245,889.47 (the amount of eligible food items the Review Officer "allowed"), the total amount of eligible food purchases made by Skyson during the relevant time period is $665,080.84.  (Son Decl'n ¶ 24.)  Considering that Skyson would have marked up the prices on those items by 10% to 40%, Skyson's SNAP redemptions totaling $669,900.17 is fully supported by the evidence before the Court. (AR 1237, 1266; Son Decl'n ¶ 28.)

---

[1] The Court notes that the table below paragraph 24 of Mr. Son's Declaration states the "Additional Receipts" amount for December 2008 is $60,501.70.  (Son Decl'n ¶ 24.)  This appears to be a typo, as Ex. 4 states that the amount for December 2008 should be $60,503.77. (Ex. 4.)  Nevertheless, the "Total" amount for the "Additional Receipts" column is correct, at $419,191.37.

Furthermore, at the February 25, 2009 site visit by FNS, "a moderate stock of items, consisting primarily of canned fish and corned beef" and "an ample supply of bulk foods" were found.  (AR 787, 790, 1266.)  Based on that site visit, FNS determined "there is little doubt the store has a substantial amount of inventory that would support large transactions."  (AR 790.)  The observations made during that site visit support the conclusion that Skyson carried sufficient inventory to support its SNAP redemptions.  Accordingly, in light of the evidence before this Court, the Court disagrees with the Review Officer's statement that "it is questionable whether [Skyson] had a sufficient stock of eligible food items on hand during the focus period with which to have justified its overall SNAP redemptions."  (AR 1266.)

B.     SNAP Purchases by Homeless People

The Review Officer was also concerned about SNAP purchases made by homeless families at Skyson and supported her finding that Skyson trafficked food stamps by pointing to their large purchases.  (AR 1265.)  She concluded that "it is not reasonable to assume that [transactions by homeless people] involved solely the purchase of eligible food items."  (Id.)  Her reasoning was that (1) homeless people "likely did not have ready access to transportation," which she thought "would preclude such households from making large purchases of eligible

15

foods" and (2) homeless people "would not have had the storage or preparation facilities needed to accommodate eligible foods."  (Id.)

The Court is not persuaded by the Review Officer's reasons for questioning their purchases.  It is not uncommon for homeless people to make large purchases because they sometimes band together and alternate purchasing food for the group, and also because they shop for many people in their families.  (Nunies Decl'n ¶ 11; Suwaiter Decl'n ¶ 3.)  It is also common for homeless people to make large purchases within five days of receiving their SNAP benefits and to spend the rest of their benefits on perishable food throughout the remainder of the month.  (Nunies Decl'n ¶ 10.)

With respect to transportation, some homeless people walk to Skyson to shop, others drive their own vehicles, and some use their friends' and/or families' vehicles for transportation.  (Sasaki Decl'n ¶ 7; Suwaiter Decl'n ¶ 7; Saimon Decl'n ¶ 7.)  Indeed, homeless people are transient by nature and are not limited to living or shopping in one area of the island.  (Mitchell Decl'n ¶¶ 8-9.)  Some of them even shop at Skyson while living in Waipahu.  (Suwaiter Decl'n ¶¶ 1, 4; Saimon Decl'n ¶¶ 1, 4.)  Because some shelters allow homeless persons to use the shelter's address as their mailing address on the SNAP application form, it

might appear that an individual is traveling far to Skyson even though they may no longer reside at the address FNS has on file.  (Mitchell Decl'n ¶¶ 11-12.)

Regarding their ability to store food items purchased at Skyson, some shelters provide a storage area for these items.  (Nunies Decl'n ¶ 6; Sasaki Decl'n ¶ 6; Suwaiter Decl'n ¶ 6; Saimon 6.[2])  Other homeless individuals store items at friends' houses.  (Nunies Decl'n ¶ 13; Saimon at 3; Sasaki at 3; Suwaiter at 3.) Homeless are also able to store items in their vehicles or tents.  Because canned foods require minimal preparation and because some shelters provide for the use of microwaves and hot plates, homeless people are likely to purchase canned goods, like those sold at Skyson.  (Mitchell Decl'n ¶ 14; Nunies  Decl'n ¶ 12.)

In sum, the evidence before the Court establishes that homeless people do make large purchases for legitimate reasons and are able to find transportation and storage space for their items.  The Court therefore disagrees with the Review Officer and finds that large purchases of eligible food items by homeless people are reasonable.[3]

---

[2] FNS points out that Suwaiter was denied SNAP benefits in 2007 and that Saimon had no SNAP transactions at Skyson during the relevant period.  (Answering Brief at 24.)  However, the Court cites to their declarations to generally show the shopping patterns of homeless people, not because they made purchases from Skyson during the months at issue.

[3] As an aside, the Court notes that it shares Skyson's concern that FNS may be "attempting to reach a result through wrongful means."  (Opening Brief at 31-32.)  Connie Mitchell, the executive director of the Institute for Human Services, notes that "homeless persons use EBT benefits to purchase food items, and may subsequently re-sell those items for

C.     Violation #1 (transactions ending in 98 cents)

FNS determined that 526 SNAP transactions at Skyson displayed a

pattern of "unusual, irregular and inexplicable activity" because the amounts

debited from the EBT cards "ended in the amount of '$0.98.'"  (AR 688, 1265.)

Skyson had explained to FNS that many of his eligible food items are priced in

amounts ending in that value.  (AR 1265.)  However, the Review Officer

determined that the transactions evidenced food stamp trafficking:

> As it relates to the pattern of multiple, same cents
> transactions, . . . [Skyson] contends that of the 526
> transactions cited by the Field Office as having ended in
> the amount of "$0.98," most are attributable to
> [Skyson's] policy of pricing a number of items in that
> amount, such as white rice at $32.98 (116 transactions),
> turkey necks or wings at $31.98 (76 transactions), cases
> of corned beef priced at $79.98 (6 transactions).
> However, the record does not indicate that [Skyson] sold
> any items at a price point of $159.98, of which there were
> 54 transactions.  While it is plausible that SNAP
> households that purchased single items ending in such a
> cents value, or items in multiples of 10 ending in equal
> cents value, would have had transaction amounts ending
> in "$0.98," it is also quite likely that such households
> would have purchased additional edible food items
> during their visit to [Skyson's] store.  Thus, their
> purchase totals would have ended in cents values other
> than "$0.98."  As a consequence, that such a number of
> transactions ended in identical same cents values is

cash."  (Mitchell Decl'n ¶ 13.)  Although the evidence does not establish that Skyson's
customers do that, even if they did, Skyson should not be penalized for its customers' shopping
behaviors if he is not trafficking food stamp benefits.

highly unlikely and thus, is considered strong evidence of trafficking.

(AR 1265.)

As Skyson explained to FNS, based on its business model, "most of the items are priced in an amount ending in 98 cents value." (Son Decl'n ¶ 27.) Indeed, Skyson's price list shows that the majority of its food items are priced that way. (AR 990-93.) The list shows prices for 113 food items, and all but twelve of those items are priced in amounts ending in 98 cents.[4] (Id.) However, Skyson's prices are not static and do fluctuate with market conditions. (Son Decl'n ¶¶ 28-30.) Sometimes items are priced in amounts ending in other values including zero cents and 99 cents. (Id. ¶ 31.)

Given that general excise tax does not apply to SNAP purchases under state law and considering Skyson's pricing model, it is very likely that the transaction amount for a single food item at Skyson would end in 98 cents. See Haw. Rev. Stat. § 237-24.3(6). As the Review Officer noted, single-item purchases account for at least 198 of the transactions underlying Violation #1. (AR 1265.) Further, because prices fluctuate and often end in zero cents or 99

---

[4] Of the twelve items, four of their prices are illegible due to the xeroxing of the price list. (AR 991.) Although those prices are unknown, they may end in 98 cents as well.

cents, purchasing a combination of various items from Skyson could easily result in transaction amounts ending in 98 cents.

Although the Review Officer acknowledged that more than one-third of the Violation #1 transactions "are attributable to [Skyson's] policy" of pricing items in amounts ending in 98 cents, she found particularly problematic transaction amounts totaling $159.98.  (AR 782-83, 1265.)  This concern was based on her observation that no single item at Skyson sold for that amount.  (AR 1265.) However, as Skyson explains in its briefs, purchasing several different combinations of items could easily lead to transactions totaling that amount:

- 2 cases of corned beef priced at $79.99 = $159.98
- 2 cases of crackers on sale at $75.00 each, plus one case of saimin at $9.98 = $159.98
- 10-lbs New York Steak at $59.98, plus 5 cases of noodles ($10 each), plus one case of corned beef on sale ($50) = $159.98

(Son Reply Decl'n ¶¶ 4-5, 7.)  Contrary to the Review Officer's finding, purchases totaling $159.98 do not indicate trafficking, as a combination of items could easily result in that amount.

In sum, Skyson adequately explains why a number of transactions ended in 98 cents and provides evidence in support thereof.  Given Skyson's pricing model, these transactions are not "unusual, irregular, and inexplicable." (AR 688.)  The preponderance of the evidence before the Court establishes that no

Violation in this regard occurred.  The Court therefore reverses the Review

Officer's finding that Violation #1 "did, in fact, occur."  <u>Kim</u>, 121 F.3d at 1272.

      D.     Violation #2 (multiple transactions in short time frames)

      FNS determined that certain SNAP transactions at Skyson displayed a

pattern of "unusual, irregular and inexplicable activity" because "multiple

transactions were made from individual benefit accounts in unusually short time

frames."  (AR 688.)  In concluding that these transactions supported a finding that

Violation #2 occurred, the Review Officer reasoned:

> With regard to the pattern of multiple transactions made from individual benefit accounts within unreasonable timeframes, the charge letter materials show 174 instances of this occurrence during the 6 month focus period.  As an example, one SNAP household, listing an address in a church multi-family residential arrangement, conducted three transactions on November 5, 2008 in identical amounts of $79.99 occurring within 11 hours and 16 minutes.  This same household conducted 2 transactions on December 2, 2008, one transaction in the amount of $79.99 and the second for $79.98 within 23 minutes.  Again, on January 5, 2009, this same household conducted 2 transactions within the space of 38 minutes, both for the identical amount of $79.99.  While it is not unreasonable for a customer or household to shop at any given store one or more times during a day, it is unlikely that multiple transactions in large, and in some cases identical dollar amounts, referenced in the Field Office's letter of charges were strictly for eligible foods.

(AR 1266.)

The transactions underlying Violation #2 were multiple transactions by individual accounts within 24 hours.  The range of time between the transactions varies from 35 seconds to 23 hours and 49 minutes.  (AR 701, 722.)

Mr. Son explains his observations of how multiple purchases by individual accounts occur at his store.  Many customers frequently shop at Skyson and are familiar with the small store and its layout so they can quickly retrieve items.  (Son Decl'n ¶ 50.)  For example, Mr. Son has witnessed parents give their EBT card to their children to purchase a snack or drink after the parent has completed the main purchase transaction.  (Id. ¶ 45.)  Because most of the snacks and drinks are located close to the cash registers, the second transaction can be made quickly.  (Id.)

Other times, customers realize they forgot to purchase certain items and return to purchase them.  If they realize this while waiting for the EBT transaction to be completed, another family member might grab the additional items while the first family member waits for the transaction to complete.  In that case, the second transaction could occur within seconds or minutes of the first.  (Id. ¶ 48.)  Or, if customers realize they forgot to purchase items after leaving the store, the second transaction might take place the next day, but within 24 hours of the first.  (Id. ¶¶ 46, 51.)

Additionally, Skyson has no shopping bags or baskets for its customers; it only has two flat-bed hand carts for use.  (Id. ¶ 52; AR 787.)  When the carts are in use, customers are limited to what they can carry by hand and may have to make additional trips to the store if unable to carry everything at once. (Son Decl'n ¶ 52.)  If a person can use only one cart, they may have to make multiple trips and purchases.  (Id.)  Also, if a person cannot push a heavy load, multiple trips and purchases may be necessary.  (Id.)  Sometimes two family members use one cart each, which might result in separate transactions for the items in each cart.  (Id.)  These scenarios explain why transactions may occur minutes apart.

The Review Officer focused in particular on transactions by Household ***9693.  (AR 1266.)  On November 5, 2008, this household made three purchases of $79.99 within 11 hours and 16 minutes of each other.  (AR 709, 1266.)  On December 2, 2008, a purchase of $79.99 was made within 23 minutes of a $79.98 purchase.  (Id.)  On January 5, 2009, two purchases of $79.99 were made 38 minutes apart.  (Id.)  Like the other transactions underlying Violation #2, these transactions are not unreasonable and do not support a finding of food stamp trafficking.

First, these transactions were made at the beginning of each month, when SNAP recipients receive their benefits.  As Mr. Son explains, based on his observations, most sales occur within the first ten days of the month shortly after SNAP benefits have been received.  (Son Decl'n ¶ 38.)  The study cited by FNS also supports this shopping behavior.  According to that study, "[m]ost households used more than half of their benefits within 1 week of issuance."  (Ex. A at 3, attached to Answering Brief.)

Furthermore, Household ***9693's transactions can be explained as separate transactions for single cases of corned beef, which Skyson has sold for $79.98 and $79.99 in the past.[5]  (Son Decl'n ¶ 30.)  Further, as described above, this Household may have been limited to hand-carrying the cases and might have had to make separate trips for each case, which would result in identical, repetitive transactions.  Where multiple purchases are made for the same item, as in this example, it is very likely and even expected that each transaction will be for identical dollar amounts.  The Court therefore disagrees with the Review Officer

---

[5] FNS argues that cases of corned beef were not priced at $79.98 or $79.99 during its February 25, 2009 site visit.  (Answering Brief at 18, AR 791.)  However, because that visit occurred after the relevant months (August 2008 through January 2009), prices observed during that site visit are irrelevant to Skyson's prices on November 5, 2008, December 2, 2008 and January 5, 2009.  (AR 1266.)

that it is "unlikely" that multiple transactions for identical dollar amounts occur. (See AR 1266.)

In sum, it is entirely reasonable for individual accounts to have multiple transactions within hours, minutes, or even seconds of each other. The Review Officer even noted in her Final Agency Decision that "it is not unreasonable for a customer or household to shop at any given store one or more times during a day." (AR 1266.) The Court concludes that the preponderance of the evidence before the Court establishes that no Violation in this regard occurred and reverses the Review Officer's finding that Violation #2 occurred. Kim, 121 F.3d at 1272.

E.      Violation #3 (benefits exhausted in short time frames)

In Violation #3, FNS charged Skyson for having 312 transactions where "the majority or all of individual recipient benefits were exhausted in unusually short periods of time." (AR 688.) The Review Officer did not separately analyze this Violation in her Final Agency Decision. (AR 1262-68.) However, FNS noted in its investigation report that the "most noteworthy [example of Violation #3] involves household ***1401 who repeatedly depleted more than 90% of their SNAP benefits in single transactions each month." (AR 783.)

According to the investigation report, Household ***1401 shopped at several stores but depleted over 90% of its SNAP benefits at Skyson during the months of September, October, November, and January.  (AR 784.)  Because this Household is homeless, FNS determined its transactions to be "highly suspicious and indicative of trafficking."  (Id.)  However, as discussed above, it is not uncommon for homeless persons to make large purchases because they have to feed many people, can obtain transportation to the store, and can store their items at various places.

Additionally, as the study cited by FNS points out, 23% of all SNAP households visit a single store per month, and the "average" household shops at "a little over three stores per month."  (Ex. A at 2, attached to Answering Brief.)  Also, 63% of households use their benefits within one week of receiving them.  (Id.)

Moreover, Mr. Son's own observations also confirm that many customers use most of their benefits within the first ten days of the month, which causes him to make several daily trips to Costco and Sam's Club to replenish Skyson's inventory.  (Son Decl'n ¶¶ 38-39.)  Given the study's findings and Skyson's observations, this shopping pattern is not "unusual, irregular and inexplicable."  (AR 688.)  The preponderance of the evidence before the Court

establishes that transactions where the majority of individual benefits were

exhausted in short time periods does not indicate trafficking.  The Court therefore

reverses the Review Officer's finding that Violation #3 occurred.  <u>Kim</u>, 121 F.3d at

1272.

F.     Violation #4 (excessively large purchases)

FNS charged Skyson for "excessively large purchase transactions . . .

made from recipient accounts."  (AR 688.)  Although the Review Officer found

that "large purchases were possible" at Skyson, she concluded that a "detailed

analysis of the invoice materials provided by Appellant reveal a question of

whether or not inventory purchases of eligible food items support the volume of

SNAP sales that were reflected in the raw EBT data."  (AR 1267.)  However, as

discussed above, Skyson's SNAP redemptions totaling $669,900.17 are fully

supported by the evidence before the Court, especially the receipts attached to

Exhibit 4.

The Review Officer and FNS were also concerned about large

purchases by homeless individuals, but those purchases are also reasonable, as

discussed in detail above.  (AR 783-85, 1265.)

Furthermore, Skyson has ample storage and inventory to support its

large sales to customers.  The store itself is approximately 2,010 square feet, with a

960 ft$^3$ indoor freezer and a 1,760 ft$^3$ indoor refrigerator.  (Son Decl'n ¶ 15.)

Outside the store are a 500 square feet dry storage area and a 490 ft$^3$ storage

freezer.  (Id. ¶¶ 16-17; AR 787.)  Because Skyson's storage area is limited, Mr.

Son makes several daily trips to wholesale stores to replenish its inventory when

necessary.  (Son Decl'n ¶ 39.)   At the February 25, 2009 store visit, FNS field

officers determined that, based on Skyson's inventory, "large purchases are

possible."  (AR 787.)

Finally, Skyson primarily sells bulk items, which logically cost more

than items sold individually.  As described above, a $159.98 purchase is easily

explainable as a purchase of two cases of corned beef.  Similarly, a $203.96

purchase could be for one case of tuna ($109.98), one case of corned beef ($79.98),

one case of dried noodles ($10.00), and 2 soda bottles ($4.00).  (Son Decl'n

¶¶ 31-32; AR 993.)  Considering that Skyson's customers enjoy shopping at

Skyson for its reasonable prices of bulk items, large purchases are likely to occur at

the store.  (Sasaki Decl'n at 3; Suwaiter at 3.)  That most SNAP recipients use the

majority of their benefits within one week of issuance also supports this

conclusion.  (Ex. 1 at 3, attached to Answering Brief.)

In sum, the Court concludes that the preponderance of the evidence

before the Court establishes that large purchases are possible and indeed likely to

occur at Skyson. The Court therefore reverses the Review Officer's finding that Violation #4 occurred. <u>Kim</u>, 121 F.3d at 1272.

G.     Penalty

As the Court reverses the Review Officer's finding that Skyson committed the four Violations, the permanent disqualification imposed is therefore "without justification in fact" and is arbitrary and capricious. <u>See</u> <u>Kahin</u>, 101 F. Supp. 2d at 1302. Accordingly, that disqualification is also reversed. 7 C.F.R. § 278.6(e) (noting that a firm shall be disqualified permanently if "[p]ersonnel of the firm have trafficked").

H.     Summary

Based on the administrative record, additional evidence provided to this Court, and the arguments made by counsel, the Court finds that the preponderance of the evidence supports Skyson's position that the four Violations charged did not occur. Additionally, the record lacks any first-hand observation that SNAP benefits were accepted by Skyson as payment for ineligible items. Contrary to FNS's argument that Skyson must address each and every transaction at issue, Skyson is only required "to prove by a preponderance of the evidence that the violations did not occur." <u>Kim</u>, 121 F.3d at 1272. Skyson has met that burden here. <u>See</u> <u>Young Choi, Inc.</u>, 639 F. Supp. 2d at 1177 ("the court can look beyond

29

the administrative record and reach its own factual and legal conclusions in a trial de novo").  Therefore, the Review Officer's finding that the four Violations occurred is reversed, as is Skyson's permanent disqualification from SNAP.

CONCLUSION

For the foregoing reasons, the Court REVERSES the Final Agency Decision that Skyson violated the Food Stamp Act and that it be permanently disqualified from participating in SNAP.  The Clerk of Court is directed to enter judgment in Skyson's favor and against the United States.

DATED:  Honolulu, Hawaii, February 22, 2010.

IT IS SO ORDERED.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Skyson USA, LLC v. United States of America, CV. 09-00278 BMK; ORDER REVERSING FINAL AGENCY DECISION.